UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and ARTHUR H. BUNTE, JR., as Trustee, | ) ) ) ) | 14 C 6163 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) | |
| STANDARD ELECTRIC CO., | ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

For many years, Defendant Standard Electric Company's collective bargaining agreement ("CBA") with International Brotherhood of Teamsters, Local Union No. 486—a non-party to this suit—required Standard to participate in a multiemployer pension plan administered by Plaintiff Central States, Southeast and Southwest Areas Pension Fund. In early April 2011, Standard and Local 486 agreed between themselves to revise their CBA and stop participating in the Central States pension plan, retroactive to March 31, 2011. In this suit under § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, Central States alleges that because the CBA had a year-to-year evergreen clause, and because Standard and Local 486 did not timely terminate the CBA by March 31, 2011, Standard was obligated to continue contributing to the pension fund through March 31, 2012. Doc. 1. (The other plaintiff, the Fund's trustee, will be ignored for ease of exposition.) The operative complaint seeks a judgment against Standard for its allegedly delinquent contributions from April 2011 through March 2012, plus interest and liquidated damages. Doc. 34. Standard has moved for summary judgment, Doc. 24, and Central States has moved for partial summary judgment as to liability, Doc. 35. Central States' motion is granted and Standard's motion is denied.

1

**Background**

When considering Central States' motion, the facts are viewed in the light most favorable to Standard, and when considering Standard's motion, the facts are considered in the light most favorable to Central States. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006). Because the court will rule in favor of Central States, the following facts are set forth as favorably to Standard as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). That said, the pertinent facts are almost entirely undisputed, either by agreement or because the fact simply recites what a document states.

Standard is a commercial distributor of electrical supplies. Doc. 38 at ¶ 2. In 1978, Standard and Local 486 entered into a participation agreement with the Central States pension fund. Doc. 42 at ¶ 9. The participation agreement required Standard to contribute to the pension fund for the benefit of its employees "during the life of the current [CBA] between the parties and during all renewals and extensions thereof." *Id*. at ¶ 10; Doc. 25-3 at p. 3, ¶ 7. The participation agreement further provided that "the obligation to make contributions to the Fund shall be terminated when and if such contributions are no longer required by a [CBA] between the parties." Doc. 25-3 at p. 3, ¶ 7. The participation agreement bound Standard and Local 486 to Central States' Trust Agreement:

> The Union [Local 486] and the Employer [Standard] agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement creating said CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, all of the rules and regulations heretofore and hereafter adopted by the Trustees of said Trust Fund pursuant to said Trust Agreement, and all of the actions of the Trustees in administering such Trust Fund in accordance with the Trust Agreement and rules adopted.

Doc. 42 at ¶ 11; Doc. 25-3 at p. 3, ¶ 1.

Article III, § 7(a) of the Trust Agreement states: "An Employer is obliged to contribute to the Fund for the *entire term* of any collective bargaining agreement accepted by the Fund on the

terms stated in that collective bargaining agreement …." Doc. 42 at ¶ 21 (emphasis added); Doc. 37-4 at 12.  Article III, § 1 of the Trust Agreement addresses the circumstances under which Standard could relieve itself of its obligation to contribute to the pension fund once the CBA has terminated:

> Except as provided in [inapplicable provisions], the obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) *after* termination of the collective bargaining agreement until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its contributions at the above-specified address.

Doc. 42 at ¶ 23 (emphasis added); Doc. 37-4 at 10 (reproduced by Standard at Doc. 25-4 at 4).

In 2009, Standard and Local 486 entered into a successor CBA.  Doc. 38 at ¶ 4.  Article 42, § 1 of the 2009 CBA contained a year-to-year evergreen clause, providing that the 2009 CBA would terminate on March 31, 2011 only if Standard or Local 486 sent a cancellation or termination notice sixty days before that date; absent such a notice, the 2009 CBA would continue in force until March 31, 2012:

> This Agreement shall be in full force and effect from April 1, 2009 to and including March 31, 2011, and shall continue in full force and effect from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to the date of expiration.

Doc. 42 at ¶ 14; Doc. 25-2 at 6.  Article 42, § 2 provided a mechanism for Standard and Local 486 to seek to amend the 2009 CBA rather than cancel it:

> [W]here no such cancellation or termination notice is served and the parties desire to continue said Agreement but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to March 31, 2011, or April 1st of any subsequent contract year, advising that such party desires to continue this Agreement but also desires to revise or change terms or conditions of such Agreement.

Doc. 42 at ¶ 14; Doc. 25-2 at 6.

3

On January 8, 2011—before the deadline set by Article 42, § 2—Local 486 sent a letter to Standard indicating its "desire to negotiate certain changes and modifications in the present" CBA. Doc. 42 at ¶ 15; Doc. 25-5 at 2. On April 10, 2011, Standard and Local 486 agreed to a revised CBA, which provided in pertinent part that they would stop participating in the Central States pension fund and instead would offer 401(k) retirement plans to Standard's employees. Doc. 38 at ¶¶ 11, 13. The next day, April 11, Standard sent Central States a letter stating: "Standard … and [Local 486] have approved a [successor CBA] that terminates Standard['s] participation in the [pension fund] effective March 31, 2011." Doc. 42 at ¶ 16; Doc. 25-8 at 2. Consistent with its letter, Standard stopped making payments to the Central States pension fund on or shortly after March 31, 2011. Doc. 38 at ¶ 15. (Although Standard's Local Rule 56.1(a)(3) statement asserts that it stopped paying contributions as of March 31, 2011, Doc. 25 at ¶ 15, its Local Rule 56.1(b)(3)(B) response to Central States' Local Rule 56.1(a)(3) statement asserts, without citing the record, that it paid contributions through April 10, 2011, Doc. 42 at ¶ 30. Given the disposition of the cross-motions for summary judgment, the court need not resolve that discrepancy right now.)

**Discussion**

This case turns on two questions. The first is whether the termination date of the 2009 CBA was ever March 31, 2012. If not—that is, if the termination date at all times was March 31, 2011—then Standard's April 11, 2011 letter to Central States likely would qualify under Article III, § 1 of the Trust Agreement as a "written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund," which in turn would limit Standard's contribution obligations to the period of time from the "termination of the collective bargaining agreement [March 31, 2011, on this view] until the date" Central States received the April 11

letter.  Doc. 37-4 at 10.  If, by contrast, the 2009 CBA at any point had a termination date of March 31, 2012, then a second question arises: Whether Standard and Local 486 could agree between themselves to retroactively terminate the 2009 CBA as of March 31, 2011—that is, to move the termination date from March 31, 2012 to March 31, 2011—not only as it pertains to their obligations *to one another*, but also to eliminate Standard's duty to contribute to the Central States pension fund as of the date Central States received the April 11, 2011 letter.  The respective answers to these questions are "yes" and "no," which results in the conclusion that Standard was required to contribute to the Central States pension fund through March 31, 2012.

With respect to the first question: As noted above, Article 42, § 1 of the CBA (the evergreen clause) provided that the CBA "shall be in full force and effect from April 1, 2009 to and including March 31, 2011, and shall continue in full force and effect from year to year thereafter *unless* written notice of desire to cancel or terminate the Agreement is served by either party upon the other *at least sixty (60) days prior to* the date of expiration."  Doc. 25-2 at 6 (emphases added).  Standard concedes that neither it nor Local 486 sent a "written notice of desire to cancel or terminate the [CBA] … at least sixty (60) days prior to the date of expiration" within the meaning of that provision.  Instead, Standard argues that because Local 486's January 8, 2011 letter was a timely notice under Article 42, § 2 of a "desire to negotiate changes or revisions in this Agreement," *ibid*., and because Standard and Local 486 thereafter negotiated revisions to the 2009 CBA, the 2009 CBA was superseded by a new CBA on April 10, 2011.  Doc. 41 at 6-10.

Standard's argument misses the point.  Even if Local 486's January 8, 2011 letter *opened up* the CBA for *revisions*, it did not *terminate* the CBA.  Article 42, § 2 erects a clear distinction between seeking revision of and terminating the 2009 CBA; it states that Local 486 or Standard

5

could send a notice of "desire to negotiate changes or revisions" only "where *no such cancellation or termination notice* is served [under Article 42, § 1] and the parties desire *to continue* said Agreement." Doc. 25-2 at 6 (emphases added). It follows that Local 486's January 8, 2011 letter did not cause and could not possibly have caused the 2009 CBA to "terminate" on March 31, 2011. And once January 30, 2011 (sixty days before March 31) passed without Local 486 or Standard sending a "written notice of desire to cancel or terminate" under Article 42, § 1, the 2009 CBA's new expiration date automatically became March 31, 2012.

The fact that the 2009 CBA's expiration date was—at least for some period of time—March 31, 2012 has consequences under the Trust Agreement. As noted above, Article III, § 7(a) of the Trust Agreement obligated Standard to contribute to the Central States pension fund "for the entire term of" the 2009 CBA. Doc. 37-4 at 12. The phrase "entire term" means what it says: the 2009 CBA's *entire* term, not some portion of the term. *See Black's Law Dictionary* 649 (10th ed. 2014) (defining "entire" as "[w]hole; complete in all its parts" and "[n]ot divisible into parts"). So, once the 2009 CBA's expiration date—that is, the end of its term—became March 31, 2012, § 7(a) locked in Standard's contribution obligation through that date.

This leads to the second question, which is whether Standard and Local 486's April 10, 2011 agreement between themselves to reset the 2009 CBA's termination date back to March 31, 2011 and enter into a successor CBA allowed them to eliminate Standard's duty to contribute to the Central States pension fund through March 31, 2012. The question is one of contract law: Whether parties to a contract (here, Standard and Local 486) may eliminate the right of an intended beneficiary (here, Central States) without the beneficiary's consent. Although this is an ERISA case, the question must be resolved by consulting "ordinary principles of contract law."

*M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) (holding that federal courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law").

Black letter law, as expressed in the *Second Restatement*, provides that a contract's intended beneficiary may enforce the contract's original terms even if the contractual parties agree to change those terms. *See Restatement (Second) of Contracts* § 304 (1981) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."); *id*. § 311(1) ("Discharge or modification of a duty to an intended beneficiary by conduct of the promisee or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides."); *id.* §§ 311(2)-(3) (providing that the "power to discharge or modify the duty" to the intended beneficiary "terminates when the beneficiary … materially changes his position in justifiable reliance on the promise"); *see also Price v. Pierce*, 823 F.2d 1114, 1121-22 (7th Cir. 1987) (approvingly citing § 311 as reflecting the federal common law of contracts regarding third-party beneficiaries). The *Second Restatement*'s view of a third-party beneficiary's rights governs here. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987) (noting that ERISA preempts state common law and directs federal courts to develop a federal common law of contracts); *Orth v. Wis. State Emps. Union Counsel 24*, 546 F.3d 868, 873-74 (7th Cir. 2008) (applying § 311 to interpret a CBA in an ERISA suit); *Central States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc) (in an ERISA contribution case brought by a pension fund against an employer, citing *Price* and § 311 for the proposition that "the presence of a third-party beneficiary can prevent modification of the contract, once it is properly formed"); *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d

819, 822 (9th Cir. 1985). Under the *Second Restatement*, contractual parties may not "modify the contract without any [intended] beneficiary's consent" (1) where the "contract expressly prohibits the parties from modifying their duties to intended beneficiaries" *or* (2) where the beneficiary "justifiably relies on" the unmodified provision. *Price*, 823 F.2d at 1122; *see also Restatement (Second) of Contracts* §§ 311(1)-(3).

As Standard rightly concedes, Central States was a third-party beneficiary to the 2009 CBA. Doc. 26 at 9 n.1 ("Indeed, the Fund is but a third-party beneficiary to the contractual relationship between Local 486 and Standard Electric."); *see Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 609 (7th Cir. 2002) ("Of course, this dispute is not between the employer and the union; it is between the Funds, a third party beneficiary of the contract, and an employer."). By requiring Standard to continue contributing to the Central States pension fund "for the entire term" of the 2009 CBA, Article III, § 7(a) of the Trust Agreement "expressly prohibit[ed] the parties from modifying their duties to" Central States. *Price*, 823 F.2d at 1122. Accordingly, once the CBA's evergreen clause was triggered by Standard and Local 486's failure to give timely "written notice of desire to cancel or terminate" the 2009 CBA, the 2009 CBA's "entire term" automatically extended to March 31, 2012, and § 7(a) operated to expressly prohibit Standard from pulling out of the pension fund and ceasing its contributions thereto before that date.

Standard argues that Central States' "rights were limited to the express language of the [CBA], which [in Article 42, § 2] included the possibility the contract could be reopened after March 31, 2011, for modification and replacement." Doc. 41 at 11 (emphasis removed). The argument proves too much: Subject to standard contract formation principles, such as adequate consideration and lack of duress, *see Contempo Design, Inc. v. Chicago & Ne. Ill. Dist. Council*

*of Carpenters*, 226 F.3d 535, 549 (7th Cir. 2000) (en banc); *Trompler, Inc. v. NLRB*, 338 F.3d 747, 751 (7th Cir. 2003); *Alaska Packers' Ass'n v. Domenico*, 117 F. 99, 102 (9th Cir. 1902), contractual parties can *always* renegotiate and modify the terms of their agreement, *see Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 852-53 (7th Cir. 2005) ("The existence of an agreement modifying a previous contract is established in the same way as any other contract.") (internal quotation marks omitted). Article 42, § 2 simply makes explicit this background principle of contract law, providing a procedure by which the parties could seek to revise their obligations *to each other* under the 2009 CBA. But § 2 does not purport to oust the background principle set forth in the *Second Restatement* and the above-cited precedents and allow Standard and Local 486 to eradicate Central States' third-party beneficiary rights in the 2009 CBA. By reading § 2 to do just that, Standard's interpretation would render toothless the "entire term" provision of Article III, § 7(a) of the Trust Agreement by leaving Central States' rights to the whim and mercy of Standard and Local 486. That, in turn, would violate the settled principle that courts should not "interpret contracts in a manner that would render specific contractual language mere surplusage." *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1121 (7th Cir. 1990); *see also Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) ("The federal courts apply federal common law rules of contract interpretation to discern the meaning of the terms in an ERISA plan, *e.g.*, *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996), and under federal common law a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.") (internal quotation marks omitted).

Standard also invokes Article III, § 1 of the Trust Agreement for the proposition that its April 11, 2011 letter to Central States terminated its contribution obligation to the pension fund.

Doc. 26 at 14-18. As noted, Article III, § 1 provides that Standard's "obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) *after* termination of the collective bargaining agreement *until* the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its contributions." Doc. 25-4 at 4 (emphases added). But Article III, § 1 does not abrogate or otherwise limit the "entire term" proviso of Article III, § 7(a). To the contrary, § 1 imposes an *additional* obligation on Standard: Not only must Standard contribute for at least the "entire term" of the 2009 CBA, as required by § 7(a), but it also must continue to contribute *after* the expiration of that term, until Central States receives either a new CBA or a written withdrawal notice. Thus, even if the April 11, 2011 letter qualified as either a new CBA or a written withdrawal notice within the meaning of § 1, it served merely to eliminate Standard's contribution obligation *after* March 31, 2012, which had become the 2009 CBA's new termination date once the evergreen clause's January 30, 2011 deadline had passed. Article III, § 1 thus imposed an additional restraint on Standard; it did not relieve it of its payment obligations through March 31, 2012.

Finally, invoking the provision of the 1978 participation agreement stating that its "obligation to make contributions to the Fund shall be terminated when and if such contributions are no longer required by a collective bargaining agreement between the parties," Doc. 25-3 at 3, Standard says that its adoption of a new CBA as of April 10, 2011 eliminated its obligation to make those contributions. Doc. 26 at 8-9. This argument begs the question; the whole dispute here is precisely whether the CBA required Standard to continue contributing to the pension plan. The 2009 CBA indisputably required contributions through March 31, 2011, and the

10

instant the evergreen clause kicked in, the CBA and the Trust Agreement extended that requirement through March 31, 2012.

Because the CBA and Trust Agreement "expressly prohibit[ed]" Standard's withdrawing from its pension plan obligations in the middle of the 2009 CBA's extended term, the court need not reach Central States' alternative argument that it assented to and "justifiably relie[d]" on the CBA's evergreen clause within the meaning of *Price*'s disjunctive second prong. *Price*, 823 F.2d at 1122; *see also Restatement (Second) of Contracts* § 311 cmt. h ("Even though there is … no change of position by the beneficiary, the power of promisor and promisee to vary the promisor's duty to an intended beneficiary is terminated when the beneficiary manifests assent to the promise in a manner invited by the promisor or promisee."). The court notes, however, that Standard failed to address this alternative argument, Doc. 41, thereby forfeiting the point anyway. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[w]e apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue"); *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011) (where the party "cited no relevant legal authority to the district court to support the proposition … the argument is waived"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to [the defendant's] motion for summary judgment."), *aff'd*, 553 U.S. 442 (2008).

## Conclusion

For the foregoing reasons, Central States' motion for partial summary judgment is granted, which necessarily means that Standard's summary judgment motion is denied. Standard

breached its obligation to contribute to the Central States pension fund through March 31, 2012, leaving only the question of damages.

February 18, 2015

_____
United States District Judge